IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ASHLEY VICTORIA FULLER, | ) | CASE NO. 1:20-cv-611 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Ashley Victoria Fuller ("Fuller") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Commissioner") denying her application for

Disability Insurance Benefits ("DIB").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C.

§ 405(g).  This case is before the undersigned Magistrate Judge pursuant to the consent of the

parties.

For the reasons explained below, the Commissioner's decision is **AFFIRMED**.

## I. Procedural History

Fuller filed an application for DIB in July 2017, alleging a disability onset date of

January 24, 2017.  Tr. 159.  She alleged disability based on the following: depression, severe

anxiety with panic attacks, obsessive compulsive disorder, and bipolar disorder.  Tr. 183.  After

denials by the state agency initially (Tr. 88) and on reconsideration (Tr. 103), Fuller requested an

administrative hearing (Tr. 111).  A hearing was held before an Administrative Law Judge

("ALJ") on November 14, 2018, at which time Fuller amended her alleged onset date to July

2017.  Tr. 37-75; 15, 178.  In his February 22, 2019, decision, the ALJ determined that there are

jobs that exist in significant numbers in the national economy that Fuller can perform, i.e. she is

not disabled.  Tr. 23-24.  Fuller requested review of the ALJ's decision by the Appeals Council (Tr. 157) and, on January 22, 2020, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Fuller was born in 1989 and was 27 years old on her alleged onset date.  Tr. 23.  She last worked in 2015 as a medical billing coder.  Tr. 52-53.

### B. Relevant Medical Evidence

In 2016, Fuller was treated at PsychBC for generalized anxiety disorder and major depressive disorder, recurrent, moderate.  Tr. 373, 449.

In February 2017, Fuller returned to PsychBC; she had not been seen since July 2016.  Tr. 390.  Her depression, anxiety, and obsessive thoughts had decreased; she still experienced anxiety and obsessive thoughts, but those conditions were not as debilitating as they had been.  Tr. 390.

On March 13, 2017, Fuller was assessed at Signature Health for therapy services.  Tr. 471, 477.  She reported severe anxiety.  Tr. 479.  She was currently prescribed Prozac and Effexor.  Tr. 479.  She was diagnosed with major depressive disorder, single episode, unspecified, and tobacco use disorder.  Tr. 471.

On April 12, 2017, Fuller returned to PsychBC for a follow up and saw certified nurse practitioner Ms. Halter, reporting her mood as "awful."  Tr. 386.  Her symptoms had increased since the prior week and she rated her depression, anxiety and OCD 10/10.  Tr. 386.  Her medications were adjusted.  Tr. 388.

On June 14, 2017, Fuller saw Nurse Halter and reported that she had good days and bad

days; currently more good days than bad.  Tr. 378.  Her depressive symptoms had decreased, her anxiety symptoms had slightly decreased, and her OCD symptoms remained 10/10.  Tr. 378. She was not taking her clonazepam because she didn't like it.  Tr. 379.  Her medications were adjusted.  Tr. 380.

On July 27, 2017, Fuller returned to Nurse Halter at PsychBC.  Tr. 373.  She rated her depression, anxiety and OCD all at 6/10.  Tr. 373.  Her increased medication had improved her intrusive thoughts.  Tr. 373.  Her energy level was lower than normal.  Tr. 374.  Upon exam, she had appropriate eye contact; was attentive, cooperative, friendly and interested; she was oriented to person, place, time and situation; her speech was normal; she had an anxious affect and an anxious, depressed mood; she had circumstantial, depressive thoughts; an adequate fund of knowledge; and her insight was fair and her judgment was "fair, good."  Tr. 375.  She was diagnosed with obsessive-compulsive disorder, persistent mood disorder, generalized anxiety disorder, and panic disorder without agoraphobia.  Tr. 376.  Her medications were adjusted.  Tr. 376.

On August 12, 2017, Fuller completed a Function Report.  Tr. 198-205.  She stated that the pressure of work caused extreme anxiety and she would shut down.  Tr. 198.  Her depression and intrusive thinking would increase, causing panic attacks.  Tr. 198.  When asked to explain what she did during the day, Fuller stated that she cleaned and took care of her child, doing everything for her, and used several therapy techniques to work through it as best she could.  Tr. 199.  Being away from home triggered her.  Tr. 199.  She also fed and cared for pets, which was therapeutic for her, although her mother helped her when she had bad days.  Tr. 199.  Fuller could prepare simple meals, do indoor and outdoor chores, drive, shop in stores, manage her money, and spend time with other people a few times per week, at her house or others' houses.

Tr. 200-202.  Her hobbies included playing mind games on the computer, watching television, and sleeping.  Tr. 202.  She explained that she had used 12 weeks of short-term disability and FMLA for intensive outpatient therapy and that, currently, her medications were being adjusted. Tr. 205.

On August 17, 2017, Fuller saw licensed professional clinical counselor Ms. Hart-Ogburn at Charak for an initial assessment.  Tr. 454-458.  She reported severe mood swings, intrusive, unwanted thoughts, feeling jumpy and agitated, having crying episodes, being easily distracted, and having racing thoughts.  Tr. 454.  Upon exam, she was well groomed, had normal demeanor, cognition and memory, she was restless, she had poor insight and fair judgment, fair concentration, her speech was normal, her mood was depressed and anxious and she had a flat affect, and her thought process and content were normal.  Tr. 456.

The next day, Fuller saw Dr. Lockward, M.D., at Charak for medication management. Tr. 449-553.  She discussed her past medication regimen and reported frequent intrusive thoughts, including thoughts of "what if" she acted violently towards other people.  Tr. 449.  She also described herself as an over-excessive worrier, which made her depression feel worse.  Tr. 449.  Upon exam, she was well groomed, had appropriate eye contact, normal motor activity, a cooperative demeanor, normal speech, obsessional thought content and logical thought processes, impaired attention and concentration, depressed mood and full affect, normal memory, intact reasoning, good insight and judgment, and normal impulse control.  Tr. 451-452. Her medications were adjusted.  Tr. 453.

On August 24, Fuller had a counseling session with Hart-Ogburn.  Tr. 477.  She stated that she was starting to feel depressed again, was overly anxious with intrusive thoughts, and that she had become verbally aggressive towards a family member.  Tr. 447.

On September 7, 2017, Fuller returned to Charak.  She first saw Nurse Hart-Ogburn for counseling, who observed that Fuller had an anxious mood.  Tr. 440.  Fuller reported having bad dreams the last few nights.  Tr. 440.  Afterwards she saw nurse practitioner Thompson for medication management.  Tr. 435, 439.  Fuller reported that she felt dull and that her concentration was off.  Tr. 435.  She reported vivid, unwanted dreams since starting a new medication, which she wanted to stop taking and which Thompson discontinued.  Tr. 435, 438.  Fuller stated that her anxiety was not too bad and that she was otherwise satisfied with her current medication regime.  Tr. 435.  Upon exam, she was well-groomed, cooperative, had average eye contact, normal speech, logical thought processes, a euthymic mood and full affect, good insight and judgment, and normal impulse control.  Tr. 436-437.

On September 14, 2017, Fuller saw Thompson for a follow up, stating that she always felt like she was on the verge of depression and anxiety.  Tr. 428.  Her vivid dreams had mildly improved since her last visit as had her concentration.  Tr. 428.  Her exam findings were the same as her prior visit.  Tr. 429.  Her medications were adjusted, including tapering off Prozac and beginning Paxil.  Tr. 431.

On September 21, 2017, Fuller saw Nurse Practitioner Martin at Signature Health.  Tr. 491.  She endorsed episodic severe obsessions about disease.  Tr. 491.  She reported feeling like she was "on the verge of feeling depressed" or having an episode of intrusive thoughts.  Tr. 491.  When she starts having intrusive thoughts, she takes klonopin.  Tr. 491.  She last took one four days prior.  Tr. 491.  Upon exam, she was fully oriented, had good hygiene and appropriate dress, had adequate attention and concentration, normal speech, language and thought process, average fund of knowledge, her judgment and insight were "fair, poor coping," and her mood and affect were depressed, friendly, pleasant, and mildly anxious.  Tr. 488.  She was diagnosed

with major depressive disorder, panic disorder, OCD, and "borderline traits noted but unclear at this time." Tr. 492.  Her record reads, "The patient is high risk due to severity of symptoms and comorbidity." Tr. 492.  Martin continued Fuller's medications, including her taper off Prozac and change to Paxil, and recommended individual counseling.  Tr. 492.

On October 20, 2017, Fuller saw Nurse Martin for a follow up.  Tr. 480.  Her exam findings were as above, except that her mood was euthymic and she had no apparent anxiety.  Tr. 482.  Martin continued her medications and again encouraged counseling.  Tr. 485.  Fuller had her first counseling session at Signature Health on October 23 and saw licensed social worker Ms. McClure.  Tr. 463-467.  Fuller reported having moved in with her parents recently to have more help caring for her seven-year-old daughter but that her parents did not help much.  Tr. 467.  They practiced coping skills and relaxation techniques.  Tr. 467.

On November 17, 2017, Fuller saw Ms. McClure for counseling and Nurse Martin for medication management.[1]  Tr. 512-515, 520-524.  To McClure, she reported having difficulty getting up on time in the morning to get her daughter to school and spending her days visiting friends or walking around stores to avoid being home with her parents.  Tr. 515.  To Martin, she reported decreased energy, a slightly lingering depression, she denied issues with sleep, denied isolating, denied feeling on the verge of panic, and stated that she is able to enjoy things.  Tr. 523.  She denied uncontrollable intrusive thoughts, explaining that she can change her mind set, but she still reported excessive thoughts and worry and difficulty controlling her worry at times.  Tr. 523.  She felt that there was room for improvement in her symptoms.  Tr. 523.  Her exam findings were the same as her prior visit.  Tr. 522.  Martin increased her Paxil.  Tr. 524.

---

[1] The records show that Fuller saw Nurse Practitioner Rachael McLaughlin on this date and the following dates, but it appears that Rachael McLaughlin and Rachael Martin is the same person.  See Tr. 504, 44.  For clarity, the Court will refer to this provider as Nurse Martin, as that is the name used by the parties and the ALJ.

On December 19, 2017, Fuller returned to Nurse Martin for a follow up.  Tr. 530-534.
Her exam findings were the same as her prior visit, except that her mood was depressed,
friendly, pleasant, with no apparent anxiety.  Tr. 532.  Fuller reported that the increased Paxil
helped with her intrusive and obsessive thoughts and she had not had any severe episodes lately.
Tr. 534.  She was taking her klonopin when she started to feel anxious, about three times a week.
Tr. 534.  She was still depressed and had low motivation.  Tr. 534.  Martin added a new
medication for her OCD.  Tr. 534.

On December 28, 2017, Fuller saw Nurse Hart-Ogburn at Charak and presented with an
anxious and worried mood.  Tr. 507.  She had been Googling information on her medications
and stated that she believed that she had not been so bad when she wasn't taking medications and
that her medications may be making her symptoms worse.  Tr. 507.  She was advised to discuss
her concerns with her psychiatrist and not to Google so much.  Tr. 507.

On January 10, 2018, Fuller returned to Nurse Martin at Signature Health.  Tr. 535-539.
She reported increased symptoms due to her recent medication change to the OCD medication.
Tr. 535.  Her exam findings were as her prior visit except that her mood was depressed, friendly,
pleasant, and mildly anxious.  Tr. 537.  The titration to increase her OCD medication was paused
and she was continued on her current medication regime, including her lower dose of Paxil.  Tr.
535.  She returned on January 16, and her exam findings were the same as her prior visit except
that her mood was with no apparent anxiety.  Tr. 542.  She reported feeling "blah," with low
motivation and energy.  Tr. 544.  She denied severe depression, her intrusive thoughts had
"calmed down," and she was having issues with binge eating.  Tr. 544.  Her recently added OCD
medication was discontinued and her Paxil was increased.  Tr. 545.

On January 25, 2018, Fuller returned to Nurse Martin.  Tr. 546.  Her exam findings were

the same as her prior visit.  Tr. 548.  Her symptoms had worsened; her anxiety had increased and she was relying on her klonopin regularly.  Tr. 550.  Her medications were continued.  Tr. 550. On February 8, Fuller returned to Martin and reported that she was doing okay.  Tr. 551, 555. Her exam findings were the same as her prior visit, except that her mood was euthymic, friendly, pleasant, and she had no apparent anxiety.  Tr. 553.  She was "using only about 2 klonopin a week."  Tr. 555.  Her medications were continued.  Tr. 555.

On February 26, 2018, Fuller returned to Nurse Martin.  Tr. 556.  Her exam findings were the same as her prior visit.  Tr. 558.  She reported continued episodes of feeling "crabby and blah."  Tr. 559.  Her motivation had improved; she was going to the gym every morning at 4:00 a.m.  Tr. 559.  Her medications were continued.  Tr. 559.

In March and April 2018, Fuller saw Nurse Martin and indicated that she was doing okay.  Tr. 564 (March 28, "She states she has been doing okay lately" and had not been using her klonopin much since her last appointment), 569 (April 19, "She states that she is doing okay" and she was not using her klonopin often, only when she felt depressed, a few times a month). Her exam findings were the same as her previous, recent visits: fully oriented, good hygiene and appropriate dress, adequate attention and concentration, normal speech, language and thought process, average fund of knowledge, her judgment and insight were "fair, poor coping," and her mood and affect were euthymic, friendly, pleasant, and no apparent anxiety.  Tr. 563, 568.

In May 2018, Fuller saw Nurse Martin reporting that she had had two root canals; as a result, she had been diagnosed with a condition involving facial nerve pain for which she was on new medications.  Tr. 571, 574.  She had joined an online support group for her new condition, was told it is incurable, and was frustrated about it and on the verge of tears.  Tr. 574.  Her recent diagnosis triggered an episode of severe depression, just as she was "getting her life together as

far as her mood" and felt like her life had been normal.  Tr. 574.  Upon exam, she was fully oriented, had good hygiene and appropriate dress but was tearful, had adequate attention and concentration, normal speech, language and thought process, average fund of knowledge, her judgment and insight were "fair, poor coping," and her mood and affect were irritable with mild anxiety.  Tr. 573.

In July 2018, Fuller saw Nurse Martin and stated that her nerve pain was a little better and she had not had any severe episodes of depression.  Tr. 579.   She was anxious about her upcoming disability hearing.  Tr. 579.  She had not needed to take klonopin more than a few times a month.  Tr. 579.  Upon exam, she was fully oriented, had good hygiene and appropriate dress, adequate attention and concentration, normal speech, language and thought process, average fund of knowledge, her judgment and insight were "fair, poor coping," and her mood and affect were euthymic, friendly, pleasant, and with mild anxiety.  Tr. 578.

On August 5, 2018, Fuller's friend, Ms. Racker, completed a Function Report.  Tr. 238-245.  Racker reported that she spent 7 to 9 hours a week with Fuller and that they would chat and watch television.  Tr. 238.  She stated that Fuller's symptoms happen at random "from what she tells me."  Tr. 238.  Racker indicated that Fuller would isolate herself when she was having a bad day and just spend time with her daughter, and that living with her parents allowed her time to regroup when needed.  Tr. 243, 245.

On September 24, 2018, Fuller saw Nurse Martin.  Tr. 599.  She reported that she was very annoyed with most people and that she sometimes wanted to isolate herself, but that other times, she wanted to socialize.  Tr. 599.  Thinking about returning to work made her anxious.  Tr. 599.  Her exam findings were the same as her prior visit, except that her mood was irritable and mildly anxious.  Tr. 596.

**C. Opinion Evidence**

**1. Treating Source**

On December 19, 2017, Nurse Martin wrote a letter in support of Fuller's disability application.  Tr. 493.  Martin listed Fuller's diagnoses: obsessive-compulsive disorder, panic disorder, generalized anxiety disorder, and major depressive disorder.  She explained that her symptoms had been resistant to medication and that medication trials were ongoing.  Her symptoms mildly affect her ability to engage in normal activities of daily living.  During episodes of severe depression and anxiety, Fuller did not bathe or dress for days at a time, and those episodes last 4-10 days and are unpredictable and intermittent.  Her symptoms moderately affect her ability to engage with other and engage in social situations.  When her anxiety is severe, she fears interacting with others and becomes extremely paranoid and isolates herself.  Her symptoms markedly affect her ability to complete tasks in a timely manner, as her ongoing symptom of anxiety and depression are debilitating and extremely distracting.

On August 20, 2018, Nurse Martin wrote another letter stating that she had reviewed her prior letter and confirmed that the limitations expressed in that prior letter continue to be consistent with Fuller's current level of functioning.  Tr. 504.

**2. State Agency Reviewing Physicians**

On September 20, 2017, state agency reviewing psychologist Dr. Baker, Ph.D., reviewed Fuller's record and opined that she had mild limitations in understanding, remembering or applying information and interacting with others and moderate limitations in the areas of concentration, persistence or pace, and adaptation.  Tr. 81.  Regarding Fuller's residual functional capacity, Dr. Baker opined that Fuller could complete one- to five-step tasks, may need occasional flexibility with breaks when experiencing increased symptoms, can interact with

the public on a limited basis, and may need advance notice of major changes, which should be gradually implemented to allow her time to adjust to them.  Tr. 83-85.

On November 30, 2017, state-agency psychologist Dr. Haskins, Psy.D., reviewed Fuller's record and agreed with Dr. Baker's findings, except that she found Fuller had a moderate, rather than mild, limitation in interacting with others, and, regarding her RFC, opined that Fuller could perform "short cycle tasks" in a setting without fast-paced demand and she could handle tasks without strict time or production quotas.  Tr. 95, 97-99.

### D. Testimonial Evidence

#### 1. Fuller's Testimony

Fuller was represented by counsel and testified at the administrative hearing.  Tr. 39. When asked why she was no longer able to work, Fuller answered that the severity of her panic attacks and major depressive disorder fluctuated and she did not think it was beneficial for herself or others to be around her.  Tr. 45.  When asked how often she had panic attacks, Fuller explained that it's "up and down."  Tr. 45.  She goes through periods where she has them every day, multiple times a day, for weeks, and then she will go weeks without having one, and then they will start coming back again.  Tr. 45.  Her panic attacks correlate with her depression, in that one will cause the other.  Tr. 45.  The symptoms of her panic attacks are racing heart, sweating, feeling nauseous, and having intrusive thoughts.  Tr. 45.  Her intrusive thoughts are that she is going to black out and hurt someone she is close to.  Tr. 46.  She has never acted on those thoughts.  Tr. 46.  The thoughts come out of nowhere, and she is in a full panic until she takes her medication, klonopin, which helps calm her down.  Tr. 46.  Then she has on again/off again panic attacks and her depression spikes through the roof.  Tr. 46.  She tries to take her klonopin when she feels her panic attacks coming on, to stop them.  Tr. 46.

11

Fuller also takes Paxil for her OCD, depression, and panic attacks, and a medication for her nerve condition.  Tr. 47.  She started the Paxil in September or October of 2017.  Tr. 47.  She doesn't experience side effects from the klonopin, and, from the Paxil, she feels sleepy and she is gaining weight.  Her nerve pain medication also causes fatigue and some mental agitation.  Tr. 47-48.

When asked to describe her depressive periods, Fuller stated that she feels numb, teary, and wants to sleep all the time.  Tr. 48.  The last time she went through a depressive period was about two weeks prior to the hearing and it had just subsided at the time of the hearing.  Tr. 48. It lasted about 5 to 7 days.  She is still feeling some aftereffects of it, such as being extremely emotional "and stuff like that."  Tr. 49.  When asked what she was able to accomplish during those 5-7 days, Fuller answered that she was not able to do any household chores, she was able to cook meals in a microwave, she went to the grocery store once, and she did one load of laundry (versus her usual one or more loads a day).  Tr. 49.  When she is feeling really good—when her anxiety, depression and OCD aren't at an "all-time high"—she will take her daughter to the park or to a store and let her pick out something small to play with.  Tr. 50.  She usually goes to the grocery store once a month to get a "decent amount of groceries"; when asked why, she explained that it is "just too much": the way she has to go through the store, how things have to be organized, how she has to put things in the cart and on the conveyer belt.  Tr. 50.  She has to do self-checkout.  Tr. 50.  It takes too much energy.  Tr. 50.

Fuller has never been hospitalized for her condition.  Tr. 51.  At the time of the hearing, she was seeing Nurse Martin at Signature Health and had been doing so since the prior August. Tr. 51.  Fuller's attorney observed that she had been treated at two other places prior to Signature Health and that there was some overlap.  Tr. 52.  Fuller explained that her insurance had changed

and, additionally, she had heard that Martin would be a good fit for her but there were no openings, so she did some calling around to see where she could go until Martin had an opening. Tr. 52.  Charak was a place she went for treatment to fill in the gap before she could see Martin. Tr. 52.

Fuller stated that she stopped working full time as a medical billing coder in January 2017 because, on her day off, she had a very severe panic attack.  Tr. 54.  That attack resulted in her taking FLMA leave for 12 weeks and then short-term disability.  Tr. 54.  When she returned to work, she was unable to fulfill her position.  Tr. 54.  She was supposed to come back full time but ended up coming back less than full time.  Tr. 54.  She worked part time for three months, and then left.  Tr. 54.  When she was "in the process of me getting ready to leave the job," she had a couple of incidents with an employee who had made it really difficult for her to work there for two years.  Tr. 55.  She felt that the employee had maybe been part of the reason for her increased depression and anxiety.  Tr. 55.  She had conversations with other employees, who told her that they felt that she was "totally miserable" one day and then the next day "kind of all over the place."  Tr. 55.  It impacted the quality of her work.  Tr. 55.  She was making mistakes and could not get all her work packets done.  Tr. 56.  She used to do 10 to 14 packets a day and towards the end of her time working there she would have to make up lies and excuses about why she couldn't even get one packet done.  Tr. 56.  She was leaving the work for her co-workers and, therefore, she was terminated.  Tr. 56.  She was supposed to be working full time, but she only worked about 25 hours a week because she would make excuses about why she would need to leave.  Tr. 57.  Prior to that job, Fuller worked as an inpatient phlebotomist.  Tr. 57.  She left that job because the hours were not conducive to taking care of her daughter.  Tr. 59.

13

Fuller lives with her parents and her 8-year-old daughter.  Tr. 64-65.  Her brother stayed there sometimes too.  Tr. 64.  Her daughter is in school and takes the bus.  Tr. 65.  Fuller has a driver's license and drives at least once a day.  Tr. 66.  At the time of the hearing she was 5"10' and weighed 310 pounds.  Tr. 68.

When asked about socializing with others, Fuller stated that she had gotten to a point where the only people she socialized with are people in her household.  Tr. 62.  She talks to her mom and dad a lot and her mom's best friend, who stops by a lot.  Tr. 62.  She talks to her grandparents.  Tr. 62.  She sat around and chatted about 25% percent of the time, and the remaining 75% of the time she would lie on the couch.  Tr. 62.  She got enough sleep during the night—8 or 9 hours—and took a nap about once a day for 2 to 3 hours because she felt exhausted as if she couldn't stay awake.  Tr. 63-64.  When asked if she could work an 8-hour day without napping, Fuller stated "absolutely not" and explained that that was one of the biggest problems she had at her last job.  Tr. 64.  She had fallen asleep in her office several times.  Tr. 64.

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  Tr. 69.  The ALJ discussed with the VE Fuller's past relevant work as a billing clerk and phlebotomist.  Tr. 70-71.  The ALJ asked the VE to determine whether a hypothetical individual of Fuller's work experience could perform her past work or any other work if that person had the limitations subsequently assessed in the ALJ's RFC determination, described below.  Tr. 71-72.  The VE answered that such an individual could not perform Fuller's past work but could perform the following additional jobs with significant numbers in the national economy: laundry worker, wire worker, and electronics worker.  Tr. 72.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In his February 22, 2019, decision, the ALJ made the following findings:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2021.  Tr. 17.

2.  The claimant has not engaged in substantial gainful activity since January 24, 2017, the alleged onset date.  Tr. 17.

3.  The claimant has the following severe impairments: obsessive-compulsive disorder, history of panic disorder, major depressive disorder, generalized anxiety disorder.  Tr. 17.

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals any listed impairment in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 17.

5.  The claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is limited to simple, routine, repetitive tasks.  This claimant is not able to perform at a production rate pace (i.e., assembly line work) but can perform goal-oriented work.  The claimant is limited to occasional, superficial interaction with the public.  The claimant is limited to a static work environment, tolerating few changes in a routine work setting and when said changes do occur, they would need to take place gradually and would occur infrequently.  Tr. 19.

6.  The claimant is unable to perform any past relevant work.  Tr. 22.

7.  The claimant was born in 1989 and was 27 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 23.

---

[2] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 *et seq.*  The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq.*, corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

8.  The claimant has at least a high school education and is able to communicate in English. Tr. 23.

9.  Transferability of job skills in not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills.  Tr. 23.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 23.

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 24, 2017, through the date of this decision.  Tr. 24.

### V. Plaintiff's Arguments

Fuller argues that the ALJ erred in the following ways: in his step three determination, evaluating the opinion evidence and Fuller's statements regarding her symptoms, failing to consider Fuller's obesity, and relying on VE testimony.  Doc. 13.

### VI. Law and Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. The ALJ did not err at step three

Fuller argues that the ALJ erred at step three when he failed to adequately consider Listing 12.04, depressive, bipolar and related disorders, and 12.06, anxiety and obsessive-compulsive disorders.  Doc. 13, p. 10.

At step three of the disability evaluation process, a claimant will be found disabled if her impairment(s) meets or equals one of the listings in the Listing of Impairments.  20 C.F.R. § 404.1520(a)(4)(iii).  The claimant bears the burden of establishing that her condition meets or equals a listing.  *Thacker v. Soc. Sec. Admin*., 93 Fed. App'x 725, 727-728 (6th Cir. 2004) (citing *Buress v. Sec'y of Health & Human Servs*., 835 F.2d 139, 140 (6th Cir. 1987)).  Thus, a claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency."  *Thacker*, 93 Fed. App'x at 728 (citing *Evans v. Sec'y of Health & Human Servs*., 820 F.2d 161, 164 (6th Cir. 1987)).  "Each listing specifies the objective medical and other findings needed to satisfy the criteria of that listing" and a claimant "must satisfy all the criteria to meet the listing."  *Reynolds v. Comm'r of Soc. Sec*., 424 Fed. App'x 411, 414 (6th Cir. 2011) (internal quotation marks omitted).

To satisfy Listing 12.04 and 12.06, a claimant must demonstrate the paragraph A and B criteria or the paragraph A and C criteria.  20 C.F.R. Part 404, Subpart P, Appendix 1, Pt. A2. Here, the ALJ concluded that Fuller did not meet the paragraph B criteria or the paragraph C criteria.  To satisfy the B criteria, a claimant must show that she has extreme limitations in one of four areas of functioning or marked limitations in two or more areas of functioning.  *Id*.  The ALJ found that Fuller did not satisfy the paragraph B criteria because she had a mild limitation in understanding, remembering, or applying information; a moderate limitations in interacting with others; a marked limitation in the ability to concentrate, persist, or maintain pace; and a moderate

18

limitation in the ability to adapt or manage oneself.  Tr. 17-19.  Fuller argues that the ALJ erred

when he found that she had a moderate, rather than marked, limitation in her ability to interact

with others.  Doc. 13, p. 10.

> Regarding Fuller's ability to interact with others, the ALJ explained,
>
> In interacting with others, the claimant has a moderate limitation.  The claimant alleged that she had problems with social isolation at times.  She described specific interpersonal difficulties with certain family members, attributing this to both their personality traits and her own.  The claimant reported that she left her most recent work as a billing clerk due to a specific series of poor interactions with a coworker, for which she indicated she was filing an EEOC complaint.  Despite this, the evidence does not suggest that the claimant has experience[d] difficulty interacting in every workplace setting.  She notably testified that she left her prior job as a phlebotomist due to schedule conflicts as her daughter was an infant and young toddler at that time.  There was no indication that she left that work due to problems tolerating social interactions.  Further, mental status examinations throughout the relevant period from various providers, including her prescribing nurse practitioners and therapists, noted that she was polite, cooperative, and generally had appropriate speech and eye contact.  There were no interpersonal social deficits noted during her office visits.  Although she reported intrusive thoughts about "blacking out and hurting" others, there was no evidence of actual violent behavior or related problems in the community.  The claimant admitted that she had positive interaction with her young daughter, despite her child's emerging behavioral and emotional difficulties.  The claimant admitted to spending time with friends and family, at least intermittently.  She is able to leave her home and to shop in stores for basic needs and food.  The claimant's retained functioning in this area is consistent with only moderate limitations.

Tr. 18 (citations to record evidence omitted).  Fuller complains that the ALJ focused on her

ability to work and did not focus on other symptoms as evidenced as follows: Fuller's friend's

function report indicating that when Fuller was having a bad day she would isolate and rely on

her parents to help with her daughter; Fuller had reported in 2017 that she had been verbally

abusive to a family member; and Fuller had reported to Nurse Martin that she would not bathe or

dress for days at a time when experiencing severe anxiety.  Tr. 13, p. 10.

> First, Fuller's report to Nurse Martin that she would not bathe or dress for days at a time

is relevant to another area functioning: the ability to adapt and manage oneself.  When discussing

that area of functioning, the ALJ observed that Fuller had no difficulty maintaining her scheduled appointments and routinely presented with good grooming and hygiene despite her reports of low motivation.  Tr. 19.  Thus, the ALJ properly considered that evidence.

Next, the fact that Fuller had reported, once, that she was verbally abusive to a family member does not show that the ALJ's finding was erroneous.  Indeed, the record supports the ALJ's finding that there was no evidence of actual violent behavior or other problems in the community.  The ALJ also observed that there was no evidence that she had problems working with others in a work setting aside from one employee at one job; she was cooperative and behaved appropriately when interacting with providers; she had regular, intermittent contact with family and friends (in fact she lived with her parents and daughter); and she regularly left her home and shopped in stores.  That evidence supports the ALJ's conclusion that she had moderate, not marked, limitations in interacting with others.

Fuller points out that she regularly appeared depressed and anxious when meeting with providers.  Therefore, she asserts, those exam findings were overlooked when the ALJ commented that she was cooperative and behaved appropriately when meeting with her providers.  Doc. 13, p. 11.  Fuller's argument is misplaced.  The point is that despite her appearing depressed and anxious at times, she still remained cooperative and behaved appropriately.  This, too, supports the ALJ's finding that she had moderate, not marked, limitations in interacting with others.

Finally, Fuller asserts that the ALJ erred because he "failed to address all the requirements of the Listings and how Fuller satisfied those criteria as of the time of the hearing" and "clearly did not consider the effect of the combination of Fuller's psychological impairments."  Doc. 13, p. 12.  Neither of those statements are supported by any explanation.

Accordingly, those arguments are waived.  *See McPherson v. Kelsey*, 125 F.3d 989, 995–996

(6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at

developed argumentation, are deemed waived.  It is not sufficient for a party to mention a

possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.")

(internal citations omitted).

### B. The ALJ did not err when considering the opinion evidence

Fuller argues that the ALJ erred when considering the opinion evidence.  Doc. 13, pp. 12-

13.  She complains that the opinion of Nurse Martin is more thorough than the state agency

reviewers' opinions, yet the ALJ found the state agency reviewers' opinions to be more

persuasive.  Doc. 13, p. 13.  This argument has no merit.  As an initial matter, the Court does not

agree that the three pages of state agency reviewers' opinions are less "thorough" than the one-

page letter written by Nurse Martin.  Compare Tr. 493 (Martin opinion), Tr. 97-99 (Dr. Haskins'

opinion).  In any event, an ALJ is entitled to give more weight to a state agency reviewer's

opinion than a treating nurse's opinion if he finds reasons for doing so, which the ALJ did find

and which he explained in great detail.  Tr. 21-22.  Fuller does not challenge the ALJ's

reasoning.

Fuller complains that the ALJ did not include in his RFC the state agency reviewers'

opinion that she may need occasional flexibility with breaks when experiencing increased

symptoms.  Doc. 10, p. 13.  However, it is well-established that an ALJ need not adopt an

opinion verbatim.  *See Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015)

("Even where an ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ

adopt a state agency psychologist's opinions verbatim; nor is the ALJ required to adopt the state

agency psychologist's limitations wholesale.").  Moreover, the opinion states that Fuller may

need occasional flexibility, not that such flexibility is mandatory.  *See Nolcox v. Berryhill*, 2019 WL 1331582, at *9. (N.D. Ohio Mar. 25, 2019) (finding no error in the ALJ's decision relying on the state agency reviewers' opinion except for the portion that indicated the claimant "may" require flexibility due to anxiety; "To treat the *possible* limitations floated by [the state agency reviewers] as an affirmative finding that the need for flexibility in shifts was mandated would improperly alter the contents of the medical source's opinion") (emphasis in original)); *Slivka v. Berryhill*, 2018 WL 3340388, at *8-9. (N.D. Ohio May 29, 2018)[3] (the ALJ did not err by failing to incorporate a state agency reviewer's opinion that the claimant "may" require occasional rest breaks and reminders; "While the ALJ did not expressly state that he was rejecting this so-called opinion concerning breaks and reminders, the court finds nothing unreasonable or insufficient with respect to the ALJ's decision.")

In short, Fuller has not described an error by the ALJ with respect to the opinion evidence.

### C. The ALJ did not err when assessing Fuller's allegations regarding her symptoms

Fuller argues that the ALJ erred when assessing her credibility.  Doc. 13, p. 13.  A claimant's statements of pain or other symptoms alone are not sufficient to establish the existence of a physical or mental impairment or disability.  20 C.F.R. § 404.1529(a); SSR 16-3p, 2017 WL 5180304.  When a claimant alleges impairment-related symptoms, a two-step process is used to evaluate those symptoms.  20 C.F.R. § 404.1529(c); 2017 WL 5180304, *2-8. First, a determination is made as to whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms, e.g., pain.  *Id*., *3-4.  Second, once the foregoing is demonstrated, an evaluation of

---

[3] Report and Recommendation adopted, 2018 WL 3336461, at *1 (N.D. Ohio July 5, 2018).

the intensity and persistence of the claimant's symptoms is necessary to determine the extent to which the symptoms limit the claimant's ability to perform work-related activities. *Id*. at *3, 5-8. To evaluate a claimant's subjective symptoms, an ALJ considers the claimant's complaints along with the objective medical evidence, information from medical and non-medical sources, treatment received, and other evidence. *Id*. In addition to this evidence, the factors set forth in 20 C.F.R. 404.1529(c)(3) are considered: daily activities; location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; treatment, other than medication for relief of pain or other symptoms; measures other than treatment a claimant uses to relieve pain or other symptoms, e.g., lying flat on one's back; and any other factors pertaining to a claimant's functional limitations and restrictions due to pain or other symptoms. *Id*. at *7-8. The ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id*. at *10.

"An ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility. Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Calvin v. Comm'r of Soc. Sec*., 437 Fed. App'x 370, 371 (6th Cir. 2011) (citing *Walters*, 127 F.3d at 531).

Fuller argues that the ALJ "did not properly evaluate the medical evidence and make a defensible determination as to whether Fuller'[s] testimony was credible." Doc. 13, p. 15. She contends that the ALJ's reliance upon objective exam findings was "insufficient" in a case

involving psychological impairments.  Id.  She does not cite legal authority stating that an ALJ may not rely on objective exam findings in a case involving psychological impairments.  And, contrary to Fuller's assertion that the ALJ only cited objective exam findings, the ALJ did not only cite objective exam findings.  He also discussed her statements, her treatment (routine, conservative care; improved symptoms with medication), her work history ("years of successful employment"), and her reported activities of daily living (caring for her special needs daughter, among other activities).  Tr. 20-22.  *See* SSR 16-3p, 2017 WL 5180304 (To evaluate a claimant's subjective symptoms, an ALJ considers the claimant's complaints, objective medical evidence, information from medical and non-medical sources, treatment received, and other evidence).

 The ALJ did not err when assessing Fuller's allegations regarding her symptoms.

**D. The ALJ did not err with respect to Fuller's obesity**

Fuller states that the record shows she is obese and argues that the ALJ "committed harmful and reversible error when he did not address the effects Fuller's obesity had on her psychological impairments."  Doc. 13, p. 17.  She alleges that her obesity "may have exasperated [sic] her ability to interact with others and concentrate, persist, and maintain pace."  Doc. 13, p. 16; Doc. 17, p. 2.

An ALJ must consider the claimant's obesity, in combination with other impairments, at all stages of the sequential evaluation.  *See Miller v. Comm'r of Soc. Sec*., 811 F. 3d 825, 835 (6th Cir. 2016); SSR 02-1p, 2002 WL 34686281, *3-4 (obesity will be considered at all stages of the sequential evaluation and is evidenced by a diagnosis of obesity or treatment notes from an examining physician listing the claimant's height, weight and appearance, and when it appears in the record in a consistent pattern).  However, "[i]t is a mischaracterization to suggest that Social Security Ruling 02-1p offers any particular procedural mode of analysis for obese disability

claimants." *Bledsoe v. Barnhart*, 165 Fed. App'x 408, 411-412 (6th Cir. 2006).

Fuller cites no evidence that her obesity impacted her psychological impairments. Her statement in her brief that her obesity "may" have exacerbated her ability to interact with others and concentrate, persist, and maintain pace is not evidence. The ALJ did not err when he did not address the effects Fuller's obesity had on her psychological impairments because, simply put, there was nothing to discuss. *See Essary v. Comm'r of Soc. Sec.*, 114 Fed. App'x 662, 667 (6th Cir. 2004) ("The absence of further elaboration on the issue of obesity likely stems from the fact that Essary failed to present evidence of any functional limitations resulting specifically from her obesity."). Fuller herself did not testify that her obesity caused limitations or impacted her psychological impairments. *See id.* (citing *Forte v. Barnhart*, 377 F.3d 892, 896 (8th Cir. 2004) (rejecting claim that the ALJ erred in failing to consider obesity when assessing an RFC; "Although his treating doctors noted that [the claimant] was obese and should lose weight, none of them suggested his obesity imposed any additional work-related limitations, and he did not testify that his obesity imposed additional restrictions."). The ALJ did not err with respect to Fuller's obesity.

### E. The ALJ did not err when he relied on VE testimony

Fuller argues that the ALJ erred when he found that there were jobs in the national economy that Fuller could perform. Doc. 13, p. 18. The basis for Fuller's argument is that the ALJ's hypothetical presented to the VE was insufficient because it did not contain a restriction that Fuller needed to take extra breaks or work in an isolated setting for half the workday. Doc. 13, pp. 17-18. However, because the ALJ's RFC determination did not include those restrictions, the ALJ's reliance upon the VE's testimony regarding the jobs that Fuller could

perform is not error.  And, as explained above, the ALJ's RFC determination itself was not erroneous.

In her reply brief, Fuller argues, for the first time, that the ALJ erred because he found that Fuller had a marked limitation in her ability to concentrate, persist, and maintain pace but, Fuller alleges, his RFC determination did not take into account such a marked limitation.  Doc. 17, p. 2.  First, Fuller waived this argument because she raised it for the first time in her reply brief.  *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir.2008) (issues raised for the first time in a reply brief are deemed waived and need not be considered by the court). Moreover, the ALJ accounted for Fuller's marked limitation when he limited her to performing simple, routine, repetitive tasks and precluded her from work at a production rate pace.  Tr. 19. That limitation is consistent with all the opinion evidence in the record, including Nurse Martin's, who found that Fuller could not perform daily tasks in a timely manner.  Tr. 493.  See also Tr. 98 (state agency reviewer's opinion limiting her to short cycle tasks in a setting without fast pace demand); Tr. 18 (ALJ explaining that Fuller had a marked limitation in the area of concentration, persistence and pace but that it was not work preclusive, citing objective exam findings indicating Fuller's attention and concentration were adequate, and that she was able to drive, take care of her daughter, and play computer games, all requiring concentration and focus).

Fuller has not identified an error on the part of the ALJ.  Accordingly, the ALJ's decision is affirmed.

## VII. Conclusion

For the reasons set forth herein, the Commissioner's decision **AFFIRMED**.


IT IS SO ORDERED.


Dated: February 9, 2021                    */s/Kathleen B. Burke*
                                           _____
                                           Kathleen B. Burke
                                           United States Magistrate Judge